Steven **MEYER, Marc Bell, Larry Mulligan–Gibbs and Aimee Johnson, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**UNITED STATES TENNIS ASSOCIATION, Defendant.**

**No. 11 Civ. 6268 (ALC)(MHD).**

United States District Court, S.D. New York.

Dec. 6, 2013.

Law Office of Mitchell Schley, LLC, Natalie Sharon Marcus, Abbey Spanier, LLP, New York, NY, for Plaintiffs.

Richard J. Rabin, Kelly Lynn Brown, Nathan J. Oleson, Akin Gump Strauss Hauer & Feld LLP, New York, NY, for Defendant.

### Order

ANDREW L. CARTER, JR., District Judge:

For the reasons stated on the record at the telephone status conference held on December 6, 2013, this Order SUPERSEDES the Court's order issued on April 25, 2013 (ECF No. 84).

Plaintiffs Steven Meyer, Marc Bell, Larry Mulligan–Gibbs and Aimee Johnson ("Plaintiffs"), individually and on behalf of all others similarly situated, assert that Defendant United States Tennis Association ("USTA") violated the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and New York Labor Law ("NYLL"), by failing to compensate their tennis umpires for hours worked in excess of forty hours per week. Plaintiffs now move for class certification of their NYLL claims pursuant to Federal Rule of Civil Procedure 23. For the reasons that follow, Plaintiffs' motion is granted.

### I. Factual Background

The USTA is a New York "not-for-profit corporation" that is "the largest tennis organization in the world, with 17 geographical sections, more than 700,000 individual members and 7,000 organizational members[.]" (Memorandum of Law in Support of Motion for Class Certification, Dkt. No. 49 ("Pl.'s Mem."), at 4.) According to the USTA's website, the USTA owns and operates the U.S. Open. *Id.* The U.S. Open is held annually during a three-week period beginning at the end of August at the Billie Jean King Tennis Center (the "Tennis Center") in Queens, New York. (Pl.'s Mem. at 1.)

The USTA uniformly classifies all umpires as independent contractors and reports the umpires' pay to the IRS on Form 1999. (Class Action Complaint, Dkt. No. 1 ("Compl.") at ¶ 4.) Most umpires retained to

Judith Lynne Spanier, Abbey Spanier Rodd & Abrams, LLP, Mitchell Allen Schley,

work the U.S. Open sign "largely the same" agreements with the USTA in which they agree to provide services as independent contractors. (Memorandum of Law in Opposition, Dkt. No. 60 ("Def.'s Opp."), at 9.) The USTA pays all umpires a fixed, non-negotiable daily rate (Kaufman Tr. At 157:10–16) and does not pay the umpires at overtime rates for hours worked in excess of 40. (Pl.'s Mem. at 8.) Plaintiffs' compensation under these agreements varies from $115 per day to $250 per day depending upon plaintiffs' certification level. (Pl.'s Mem. at 1, 7.)

The NYLL was enacted to protect employees. Under the NYLL, employers must pay a "premium rate of one and one-half times their regular rate of pay for hours worked in excess of 40 in a workweek." *See* NYLL §§ 650 *et seq.;* N.Y. Comp.Codes R. & Regs. Tit. 12, § 142–2.2 ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13[,] of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938, as amended; provided, however, that the exemptions set forth in section 13(a)(2) and (4) shall not apply.").

The USTA and Plaintiffs disagree as to the soundness of plaintiffs' classification as independent contractors and the motives behind it. Plaintiffs argue that umpires are misclassified as "independent contractors" within the strictures of FLSA and the NYLL. (Compl. at ¶ 4.) Plaintiffs assert that such a misclassification case is ideally situated for the class action mechanism (*see generally* Pl.'s Mem.). In contrast, the USTA contends that the individualized proof necessary to determine whether a given umpire's duties deviate from the entire purported class is ill-suited for class-wide determination. (Def.'s Opp. at 14.)

According to the USTA, umpires' roles vary while at the U.S. Open. (Def.'s Opp. at 7.) Some umpires may serve primarily as line umpires. Line umpires at the U.S. Open officiate in a variety of configurations on a "one-hour-on, one-hour-off" schedule at a specified court for all or part of the day. *Id.* Line umpires stand on the perimeter of the court and only make calls on "questions of fact" that require little discretion and independent judgment, for instance (1) determining whether a ball landed inside or outside a line on the tennis court or (2) calling a "foot fault" which means that a player's foot was not in the proper place when making a serve. (Kaufman Tr. at 25:24–25:12; *Id.* at 55:7–15.) Tennis courts have ten lines, five on each side when a "full crew" is working, each line umpire "is responsible for only one line" and thus as many as ten line umpires work a single match. (Kaufman Tr. at 88:20–23.) Line umpires may obtain several levels of certification from the USTA—provisional, sectional, national, USTA, and professional, in ascending order—that affect their pay at the U.S. Open. (Johnson Tr. at 71:12–87:7; Kaufman Tr. at 50:23–51:10.) Other umpires may serve exclusively as chair umpires. *Id.* Chair umpires at the U.S. Open exercise additional authority beyond that of the line umpires, evaluate line umpires' performance, and work specific matches rather than on a one-hour-on, one-hour-off schedule. *Id.* Other umpires serve in both roles to varying degrees throughout the tournament. (*See, e.g.,* Oleson Deck, Ex. 2 (Johnson Tr.) at 160:5–160:10.)

All umpires work in a single location: the Tennis Center in Queens or a nearby location if weather requires. (Pl.'s Mem. at 7.) A small percentage of umpires come from foreign countries to work at the Open; the USTA refers to these umpires as "international." (Kaufman Tr. at 60:8–13.) The vast majority of umpires (245 of 289 line umpires in 2012) are from the United States. (Kurtz Ex. 12.) All umpires must be approved by the USTA to work at the Open, regardless of their country of origin. Umpires from the United States must be certified by the USTA in order to work at the Open. (*Id.* at 59:15–18); international umpires must submit a recommendation from their certifying organization or submit their work history so the USTA can determine that they are qualified for the Open. (*Id.* at 60:15–61:10.) All Umpires work on a fixed schedule: arrival at 10 a.m. and departure when the USTA gives permission.

## II. Procedural History

Plaintiffs filed a class and collective action complaint in the Southern District of New York in September 2011, asserting that the USTA misclassified its umpires in order to avoid paying overtime pay as required by FLSA and the NYLL. (*See* Pl.'s Mem. at 2.) In September 2011, the USTA filed its answer. (*See* Answer to Class Action Complaint, Dkt. No. 6 ("Answer").) The USTA argues that its umpires are legitimately classified as independent contractors under the FLSA and NYLL, from which it follows that they are not entitled to overtime pay.

Plaintiffs initially moved for conditional class certification of the FLSA collective, which this Court granted on July 13, 2012. This Court determined that under FLSA's "modest factual showing" standard, Plaintiffs had demonstrated that they were sufficiently similarly situated to proceed collectively for the purposes of their FLSA claims. Plaintiffs now move for class certification of their claims, pursuant to Rule 23 of the Federal Rules of Civil Procedure. (*See* Motion for Class Certification, Dkt. No. 48 ("Mot. Class Cert.").) The USTA opposes Plaintiffs' motion on the grounds that (1) Plaintiffs cannot show commonality or typicality, (2) common questions do not predominate with respect to Plaintiffs' claims, and (3) the class action is not the superior method of adjudicating these claims. (Def.'s Opp. at 2.)

## III. Discussion

### A. Legal Standard

Judge Oetken recently addressed class certification of NYLL claims in *Jacob v. Duane Reade, Inc.*, 289 F.R.D. 408 (S.D.N.Y. 2013). As Judge Oetken stated in his detailed opinion, "Class certification is governed by Federal Rule of Civil Procedure 23, which requires that the party seeking certification 'has satisfied the four prerequisites of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation.' *Marisol v. Giuliani,* 126 F.3d 372, 375 (2d Cir.1997). Additionally, a party seeking class certification must also show that at least one of the three criteria enumerated in Rule 23(b) is satisfied. *Id.* at 376. Here,

Plaintiffs have sought certification under Rule 23(b)(3), which requires that 'questions of law or fact common to class members predominate over any questions affecting only individual class members.' Fed.R.Civ.P. 23(b)(3). Moreover, Rule 23(b)(3) requires that the court find 'that a class action is superior to other available methods of adjudication.' *Id.* The rule lists four nonexclusive factors which go to the heart of this inquiry:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.* at 23(b)(3)(A)-(D).

In contrast to the 'some showing' standard for collective certification under FLSA, putative class representatives must show that the certification requirements are met by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.,* 546 F.3d 196, 202 (2d Cir.2008) ('Today, we dispel any remaining confusion and hold that the preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements.'). When making the Rule 23 determination, district courts must 'assess all of the relevant evidence admitted at the class certification stage.' *In re Initial Public Offerings Sec. Litig.* [ (*In re IPO* ) ], 471 F.3d 24, 42 (2d Cir.2006). In sum,

(1) a district judge may certify a class only after making determinations that each of the Rule 23 requirements has been met; (2) such determinations can be made only if the judge resolves factual disputes relevant to each Rule 23 requirement and finds that whatever underlying facts are relevant to a particular Rule 23 requirement have been established and is persuaded to rule, based on the relevant facts and the applicable legal standard, that the requirement is met; (3) the obligation to make such determinations is not lessened by overlap between a Rule 23 requirement and a

merits issue, even a merits issue that is identical with a Rule 23 requirement; [and] (4) in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement....

*Id.* at 41.

A plaintiff's pleadings are taken as true for the purposes of examining a class certification motion. *Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978). However, it does well to note that the class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.' *Califano v. Yamasaki,* 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Thus, '[i]n order to justify a departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members."' *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011) (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (internal quotations omitted)). Rule 23's requirements accordingly act to 'ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate.' *Id.*" *Jacob,* 289 F.R.D. at 412–13.

### B. Application of Rule 23(a) Factors

Plaintiffs propose a class of all umpires who worked at the U.S. Open beginning in 2005 (the "Class" or the "Umpires") and through the date of final judgment in the instant matter. (Pl.'s Mem. at 5.) In response, the USTA contends that Plaintiffs cannot adequately show commonality or typicality with respect to the Rule 23(a) factors.

### 1. Numerosity

"Rule 23(a) first requires that 'the class is so numerous that joinder of all members is impracticable.' Fed.R.Civ.P. 23(a)(1). Courts generally presume numerosity where a class consists of 40 or more members. *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995) (citing 1 *Newberg On Class Actions* 2d (1985 Ed.) § 3.05)." *Jacob,* 289 F.R.D. at 413. Here, Plaintiffs claim that the USTA hired between 285 and 316 Umpires at each Open, who are members of the putative class in the instant action. (*See* Pl.'s Mem. at 16.) As a result, Plaintiffs have satisfied the numerosity requirement.

### 2. Commonality and Typicality

"Commonality refers to the second Rule 23 prerequisite, which necessitates that 'there are questions of law or fact common to the class.' Fed.R.Civ.P. 23(a)(2). Typicality 'requires that the claims of the class representatives be typical of those of the class, and "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."' *Marisol,* 126 F.3d at 376 (quoting *In re Drexel Burnham Lambert,* 960 F.2d 285, 291 (2d Cir.1992)). These two requirements 'tend to merge into one another, so that similar considerations animate analysis of [both].' *Id.*

With respect to commonality, the Supreme Court has clarified that, while '[a]ny competently crafted class complaint literally raises common questions,' *Dukes,* 131 S.Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L. Rev. 97, 131–132 (2009) (internal quotations omitted)), mere recitation of 'these questions is *not* sufficient to ... demonstrate that the class members "have suffered the same injury."' *Id.* (quoting *General Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). ... [Even] where employees of the same entity assert the same violation under a single provision of law, only where their claims 'depend on a common contention,' which is 'capable of classwide resolution no less,' will commonality in the Rule 23(a) sense be found to exist. *Id.* Thus, [when] examining commonality, a court looks to 'the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.' *Id.* (quoting Nagareda, 84 N.Y.U.L. Rev. at 132) (internal quotations omitted). Despite the

rigor of the Rule 23 requirements, commonality has never been understood to require 'that all issues must be identical as to each member,' but rather 'require[s] that plaintiffs identify some unifying thread among the members' claims that warrant[s] class treatment.' *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 156 (S.D.N.Y.2008) (quotations and citation omitted)." *Jacob*, 289 F.R.D. at 413–14.

Here, Plaintiffs assert several common questions, which include, *inter alia:* (a) whether Defendants have a policy of misclassifying Umpires as independent contractors in the years 2005–2012; (b) whether the USTA failed and/or refused to pay Plaintiffs and the Class overtime pay for hours worked in excess of 40 hours per workweek within the meaning [of NYLL]; (c) the nature and extent of class-wide injury and the appropriate measure of damages for the Class; and (d) whether the USTA denied all Umpires pay for work performed before and after the Open. (Pl.'s Mem. 17.) The USTA's alleged policy of misclassification is central to Plaintiffs' class certification inquiry. Defendants contend that "plaintiffs' argument that they are independent contractors because they are subject to control through the USTA's certification requirements is not common to the class." (Def.'s Opp. at 13.) Defendants also assert that "Plaintiffs cannot resuscitate their class contentions by arguing that resolution of their claims may be proven by reference to the USTA's policy of classifying umpires as independent contractors." (*Id.* at 22.)

■ The merits of Plaintiffs' ultimate claims under FLSA and NYLL—meaning whether or not the USTA misclassified its employees as independent contractors—are largely beyond the scope of the class certification question. "The merits can, and do, affect class certification, in the sense that merits questions and certification questions tend to overlap, but a premature inquiry into the merits should not serve as the *sine qua non* of a putative class's certification. *See Brown v. Kelly*, 609 F.3d 467, 476 (2d Cir. 2010) ("In evaluating a motion for class certification, the district court is required to make a 'definitive assessment of Rule 23 require-

ments, notwithstanding their overlap with merits issues,' and must resolve material factual disputes relevant to each Rule 23 requirement." (quoting *In re IPO*, 471 F.3d at 41)); *Cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

■ Instead, the commonality question before this Court at the class certification stage is whether the record evidence demonstrates a likelihood that common answers will be determined via a class action approach, or conversely, whether differences among [Umpires] will necessarily generate individualized, rather than common, determinations as this litigation moves forward.... Plaintiffs have made a sufficient showing that whether [the USTA] misclassifies its [Umpires] is best litigated at the class level, rather than on the individual scale. Given the uniform classification of [Umpires], the uniform description of [Umpires'] duties, the ... [finite three-week period during which the U.S. Open event takes place once a year], and the discrete, geographical location of the [Open], this Court concludes that Plaintiffs have sufficiently established commonality." *Jacob*, 289 F.R.D. at 414–15.

■ First, it is clear from the record that the USTA uniformly classifies all Umpires as independent contractors, without an individualized determination of each Umpire's individual job. However, "a generalized, central policy is not alone determinative of class certification or commonality." *Jacob*, 289 F.R.D. at 415. *Accord Youngblood v. Family Dollar Stores, Inc.*, No. 09 Civ. 3176, 2011 WL 4597555, at *5 (S.D.N.Y. Oct. 4, 2011) (" 'Where, as here, there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes ... despite arguments about 'individualized' differences in job responsibilities.' " (quoting *Damassia*, 250 F.R.D. at 160–61)).

"Defendant's contention that the dissimilarity of [Umpires'] duties defeats commonality is better suited to the predominance inquiry, discussed *infra*, together with an analysis of the Rule 23(b)(3) factors. *Cf. Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d

Cir.2010) ('With respect to the first category, Hertz's blanket exemption policy, we agree with the Ninth Circuit that while such a policy suggests "the employer believes some degree of homogeneity exists among the employees," and is thus in a general way relevant to the inquiry here, the existence of a blanket exemption policy, standing alone, is not itself determinative of "the main concern in the predominance inquiry: the balance between individual and common issues." ') Put another way, to say there are common issues, sufficient to satisfy Rule 23(a)'s commonality requirement, is not to say that they necessarily predominate. Here, [Umpires] carry out their duties for [the USTA] pursuant to a uniform policy, uniform training, uniform job description, and uniform procedures set in place for each [Open—procedures] that require adherence on the part of all [Umpires] who wish to maintain their job.... As a class, they seek a determination as to whether their work so deviates from ... their [independent contractor] classification ... to constitute a legitimate claim under NYLL—clearly a question that presents common factual issues that apply to all plaintiffs. To find that this question is not a common one would constitute an insurmountable bar for similar putative class plaintiffs to come. Thus, '[p]articularly in light of the "liberal" construction of the commonality requirement of Rule 23,' the Court finds the commonality requirement satisfied. *Damassia,* 250 F.R.D. at 157.

█ Additionally, as noted, commonality does not require plaintiffs to show that class members perform identical duties—an 'impossible task.' *White v. Western Beef Properties,* No. 07 Civ. 2345, 2011 WL 6140512, at *3 (E.D.N.Y. Dec. 9, 2011). Rather, the putative class members must have largely consistent duties, which lend themselves to common determinations. In contrast to *White,* a misclassification putative class action where deposition testimony of various company managers 'span[ned] nine different departments—Meat, Produce, Frozen, Fish, Grocery, Bakery, Deli, Dairy and Receiving— each of which has a distinct set of concerns and job duties,' *id.* at *5, it appears that [the USTA's Umpires] have similar baseline responsibilities from [year to year], and that

these general duties have not changed significantly since [2005]. Whether these baseline responsibilities require a degree of individualized proof that defeats the similarities of the common questions raised by Plaintiffs, again, is a question best suited for the predominance inquiry. *Damassia,* 250 F.R.D. at 157 ('In spite of these common issues, Duane Reade argues that there are material differences in the duties of different assistant managers that make an individual examination of each position necessary. But this argument does not refute the existence of common issues. Rather, it argues that whatever common issues exist are overwhelmed by issues particular to individual class members. As such, the argument is more appropriately addressed below in respect to the predominance requirement.').

In support of their position on Plaintiffs' alleged lack of commonality, Defendant[ ] highlight[s] the Supreme Court's recent decision in *Dukes* as a [standard] requiring increased rigor in the commonality context of Rule 23(a) analysis. (*See* Def.'s Opp. at [11–16].) And while it is clear that *Dukes* emphasizes that a putative class must demonstrate a 'common contention ... that is capable of class wide resolution,' meaning that the 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke,' *Dukes,* 131 S.Ct. at 2551, the claims in *Dukes* are distinguishable from those at issue here. For example, *Dukes* dealt with a proposed nationwide class of current and former female Wal–Mart employees alleging sex discrimination over pay and promotions. *Id.* at 2547–48. Since Wal–Mart's pay and promotion decisions were discretionarily effectuated at the local-manager level, *id.* at 2547, and given that Title VII in this context required 'significant proof' that Wal–Mart 'operated under a general policy of discrimination,' *id.* at 2553, the Court held that the plaintiffs could not demonstrate sufficient commonality. *See id.* at 2554 ('The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal–Mart's "policy" of allowing discretion by local supervisors over employment matters. On its face, of course, that is just the opposite of a uniform

employment practice that would provide the commonality needed for a class action; it is a policy *against having* uniform employment practices. It is also a very common and presumptively reasonable way of doing business—one that we have said "should itself raise no inference of discriminatory conduct [.]" ' (emphasis in original) (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 990, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988))). Nothing in *Dukes* is inconsistent with this Court's conclusion with respect to commonality. That case involved a nationwide class of women alleging disparate impact discrimination on the part of a corporate entity allowing massive discretion among its local managers; this case involves" hundreds of U.S. Open Umpires who do not receive overtime under the FLSA and NYLL. *Jacob*, 289 F.R.D. at 415–16 & n. 1.

"As for typicality, which requires that the named plaintiffs' claims be 'typical of the claims ... of the class,' Fed.R.Civ.P. 23(a)(3), the 'crux' of the inquiry 'is to ensure that "maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." ' *Marisol*, 126 F.3d at 376 (quoting *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364). As a general rule, typicality looks to whether the named plaintiffs' claims are sufficiently typical of those of the class to permit the fate of the putative class's claims to remain legally intertwined with those of the lead plaintiffs. *See Rapcinsky v. Skinnygirl Cocktails, L.L.C.*, No. 11 Civ. 6546, 2013 WL 93636, at *5 (S.D.N.Y. Jan. 9, 2013) ('At bottom, the typicality requirement concerns the fairness of allowing an entire class's claim to rise or fall with the fate of the named representative's claims; thus, that representative's claims must be typical of the class so as to prevent a false prophet from bearing the standard for an entire class of claims.'). Courts tend to interpret typicality as requiring that the class members' claims 'arise[ ] from the same course of events,' meaning 'each class member [must] make[ ] similar legal arguments to prove the defendant's liability.' *Marisol*, 126 F.3d at 376." *Jacob*, 289 F.R.D. at 416.

Here, Defendants posit that the inconsistencies between plaintiffs' testimony regarding their primary duties are indicative of the atypicality of the lead plaintiffs' claims. (*See* Def.'s Opp. at 4.) For example, Defendants point out that officials may serve as chair or line umpires at the U.S. Open. Line umpires make line calls and monitor player compliance with the rules of tennis, which they may report to the chair umpire. Line umpires' calls on "questions of fact," such as whether a ball is in or out, cannot be overturned except by the chair umpire. Chair umpires, by contrast, are in charge of the entire match. (Oleson Decl., Ex. 1 (Meyer Tr.) at 41:12–42:11.) They monitor all aspects of the match and have the authority to overrule calls made by line umpires. (*Id.* at 39:13–17; Oleson Decl., Ex. 1 (Meyer Tr.) at 179:12–16; 185:13–22.) Their decisions on these "questions of fact" are final and cannot be reviewed. (Oleson Decl., Ex. 2 (Johnson Tr.) at 43:7–44:13.) Chair umpires also decide all "questions of law" during a match, including whether a player should be penalized for various conduct, and determine issues such as whether a match should be called because of weather. (*Id.* at 43:25–45:2.)

In terms of compensation, Defendants highlight that umpires may obtain a variety of certifications as tennis officials that affect their status to officiate certain tennis tournaments. (Oleson Decl., Ex. 2 (Johnson Tr.) at 72:12–87:7.) Provisional umpires are required to undergo a written test and meet certain visual acuity requirements. *Id.* Subsequent certification levels may be obtained by taking additional classes or certification tests or working a certain number of matches. *Id.* Nonetheless, the USTA unilaterally sets the pay rates for all Umpires. All Umpires appear to be on the USTA's payroll for their work at the U.S. Open and their pay is set out in the acceptance letters that are sent to all Umpires.

Defendants also note that, whereas many tennis umpires represent in their tax returns that they are independent contractors, and some of those individuals file schedules setting forth their profits and losses in connec-

tion with umpiring (*See* Oleson Decl., Exs. 15–17; Oleson Decl., Exs. 32–33; Oleson Decl., Exs. 23–27; Oleson Decl., Ex. 3 (Bell Tr.) at 270:8–274:10.), other umpires do not claim independent contractor status for some or all of their work as tennis umpires. (Oleson Decl., Ex. 1 (Meyer Tr.) at 168:7–169:7.) Individual umpires' profit or loss from their tennis umpiring work may vary substantially. For example, Johnson recognized a profit only once during the period from 2005 through 2011. (Oleson Decl., Ex. 2 (Johnson Tr.) at 244:21–245:15.) Bell, in contrast, made a profit of several thousand dollars as a tennis umpire during the same period. (Oleson Decl., Ex. 3 (Bell Tr.) at 270:8–274:10.) Several factors affect umpires' profit or loss, including the number and type of events they worked each year, their own personal expenditures, and the compensation they could demand based on their certification level or badge status. (*See, e.g.,* Oleson Deck, Ex. 2 (Johnson Tr.) at 245:16–24; Oleson Deck, Exs. 12–14; Oleson Deck, Ex. 3 (Bell Tr.) at 275:23–276:8; Oleson Deck, Exs. 23–27; Oleson Deck, Ex. 4 (Mulligan–Gibbs Tr.) at 55:17–21; Oleson Deck, Exs. 28–29, 32–33, Oleson Deck, Exs. 20–22; Oleson Deck, Ex. 1 (Meyer Tr.) at 144:18–163:14; Oleson Deck, Ex. 9.)

▉▉▉ "It is axiomatic that '[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims.' *Robidoux v. Celani,* 987 F.2d 931, 936–37 (2d Cir.1993). While Defendants attempt to underscore the minor variations between [Plaintiffs' testimonies] to highlight the atypicality of their claims, it appears from the record that their accounts of the [Umpire] duties are largely consistent with one another, and consistent with the majority of the other deposed [Umpires'] testimony. Given that typicality 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability,' *In re Drexel,* 960 F.2d at 291, [Plaintiffs'] claims are sufficiently 'typical' of those asserted by other class members—

namely that the duties they performed … resemble those of each other. . . .

To reject [Plaintiffs] as class representatives on typicality grounds due to inconsequential variations in their testimony would be … expressly forbidden by this Circuit's precedent: to require that 'all of the allegations of the class … fit together like pieces in a jigsaw puzzle.' *Green v. Wolf Corp.,* 406 F.2d 291, 300 (2d Cir.1968). Here, the particularities of these lead plaintiffs' circumstances do not 'threaten' to become the 'focus of the litigation' any more so than those of other members of the putative class. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000). Accordingly, the typicality requirement is satisfied." *Jacob,* 289 F.R.D. at 417–18.

### 3. Adequacy

▉▉▉ "Under Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation. And second, the class members must not have interests that are 'antagonistic' to one another." *In re Drexel,* 960 F.2d at 291 (quoting *Eisen v. Carlisle and Jacquelin,* 391 F.2d 555, 562 (2d Cir. 1968)). Here, Defendants challenge the adequacy of the putative lead plaintiffs because many potential class members rely on their independent contractor status to receive preferential tax treatment regarding their income and expenses as tennis umpires. (*See, e.g.,* Oleson Decl., Exs. 15–17; Oleson Decl., Exs. 32–33, Oleson Decl., Exs. 23–27, Oleson Decl., Ex. 3 (Bell Tr.) at 270:8–274:10.) Defendant's argument ignores Rule 23's safeguard that allows the Court to "exclude from the Class any [Umpire] who requests exclusion." Fed.R.Civ.P. 23(c)(2)(B)(v). "Although some class members no doubt will opt out of the class … this does not mean that the interests of the named plaintiffs are antagonistic to those of the [Umpires] who choose to remain a part of the class, which is the relevant inquiry." *Hart v. Rick's Cabaret Int'l Inc.,* 2010 WL 5297221, at *6 (S.D.N.Y. Dec. 20, 2010). Thus, there is no evidence in the record to suggest that any proposed class members

have antagonistic interests. Additionally, Plaintiffs have amply demonstrated the adequacy of the proposed class counsel.

## C. Rule 23(b)(3) Factors

Having found that Plaintiffs have met Rule 23(a)'s requirements, the Court turns to Rule 23(b)(3). Federal Rule of Civil Procedure 23(b) states in pertinent part:

A class action may be maintained if Rule 23(a) is satisfied and if: ... (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy....

Fed.R.Civ.P. 23(b)(3).

With respect to this so-called "predominance" requirement, Defendant argues that (1) common questions do not predominate, as individualized analysis for each putative class member is required; and (2) the class action is not a superior method of adjudicating Plaintiffs' claims in this case.

### 1. Predominance of Common Questions

■■■■ " 'The "predominance" requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." ' *Myers,* 624 F.3d at 547 (quoting *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). This requirement can be satisfied only 'if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof.' *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1252 (2d Cir.2002). In making the predominance determination, a court must generally consider whether the proposed class can 'establish each of the ... required elements of [their claims] using common evidence.' *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 136 (2d Cir.2001), *overruled on other grounds by In re IPO,* 471 F.3d 24. In sum, '[w]hile a plaintiff need

not show the "exclusivity" of common questions, it must show their predominance.' *Weiner v. Snapple Beverage Corp.,* No. 07 Civ. 8742, 2010 WL 3119452, at *5 (S.D.N.Y. Aug. 5, 2010)." *Jacob,* 289 F.R.D. at 418.

■■■ "[T]he parties present divergent accounts as to the predominance of common questions related to the classification of [Umpires] as [independent contractors]. On the one hand, Plaintiffs contend that ... [Umpires'] duties are sufficiently uniform to permit a generalized inquiry into the appropriateness of their labor classification.... On the other hand, Defendants assert that the voluminous deposition testimony in this case underscores the 'individualized' and 'fact-intensive inquiry' required to determine whether [USTA Umpires] are misclassified on the whole as [independent contractors]." *Jacob,* 289 F.R.D. at 419.

The USTA notes that plaintiffs' theory that the USTA "controls the means and manner" by which plaintiffs umpire matches is based on a series of facts that are not common to the putative class. (Def.'s Opp. at 20.) The USTA points out that not all class members are subject to detailed evaluations, the number of evaluations conducted as to those that are varies, and even among the evaluated umpires, their testimony differs as to whether the evaluations affect the manner in which they call matches. (*See* Oleson Decl., Ex. 2 (Johnson Tr.) at 185:15–186:17, Oleson Decl., Ex. 4 (Mulligan–Gibbs Tr.) at 122:8–123:16, Oleson Decl., Ex. 5 (Kaufman Tr.) at 99:2–19). The USTA asserts that an individualized inquiry into each umpire's actual duties constitutes the only way to ultimately determine whether a given employee was properly classified as an independent contractor. (Def.'s Opp. at 12.) Nevertheless, all line umpires are evaluated and the USTA uses as many as ten line umpires to one chair umpire in any given match. (Kaufman Tr. at 88:20–23.) Among chair umpires, white badge and bronze badge umpires are evaluated. (Kaufman Tr. at 99:14–19.)

"The predominance inquiry in this context hinges on whether Plaintiffs have established, by a preponderance of the evidence, that the primary duties of [USTA Umpires]

are sufficiently similar to not only allow for generalized proof, as commonality demands, but also to outweigh those issues 'subject only to individualized proof.' *Moore*, 306 F.3d at 1252; *accord Damassia*, 250 F.R.D. at 159 ('[The predominance inquiry] is "more demanding" than the commonality inquiry under Rule 23(a), because it requires not only that there be disputed issues that can be resolved through "generalized proof," but also that "these particular issues are more substantial than the issues subject only to individualized proof." ' (quoting *Moore*, 306 F.3d at 1252)). Indeed, there are elements of the [USTA Umpire] position that vary from [line] to [chair umpire], and still others that require varying degrees of individualized proof. However, such distinctions do not defeat predominance unless they overshadow those common threads that bind the claims of a putative class." *Jacob*, 289 F.R.D. at 419.

### a. Primary Duties

"Here, the weight of the evidence tends to show that all [Umpires] share similar primary job responsibilities, and also have a similar understanding of their role in the [USTA] organization—a conclusion warranted from consistent threads among myriad [Umpires'] deposition testimony." *Jacob*, 289 F.R.D. at 419.

For example, deposed plaintiffs testified that all Umpires are uniformly subject to the USTA's control through the Official's Code of Conduct, which applies to all Umpires on a year-round basis despite the fact that the Open is a three-week event. (Kaufman Tr. at 167:13–168:3.) The USTA admitted that "most of the issues" that caused Umpires to be terminated in accordance with the Official's Code of Conduct "happened off court and not on court." (Kaufman Tr. at 145:6–16.) The USTA's acceptance letters and Umpire handbooks set out the time that all Umpires must report to the Open each day and dictate the manner and means by which Umpires must perform their jobs. (Kurtz Exs. 1, 13.) Umpires are required not to leave at the end of the day without the USTA's permission. (Kaufman Tr. at 181:19–182:7.) All umpires are required to attend mandatory meetings at the Open. The

USTA must approve all Umpires to work at the Open per the procedure set forth in the USTA's selection guidelines. (Kurtz Ex. 20.) Umpires must obtain the USTA's permission in order to take a day off during the Open, which is granted only if the USTA's "tournament needs" are met. (Kaufman Tr. at 139:2–140:19). Umpires must remain in or near the Umpires' lounge between matches (Johnson Tr. at 155:23–156:11; Mulligan-Gibbs Tr. at 96:20–97:8). The USTA evaluates the Umpires' on-court performance, down to details as the position of their hands and their posture and the angle at which they tilt their fingers, which the USTA uses to determine an Umpire's assignments on a daily basis. (Meyer Tr. at 82:20–83:8; Kaufman Tr. at 58:21–59:2; Pl. Br. at 12; Kurtz Ex. 1.)

At bottom, the deposition testimony reflects that most Umpires perform similar day-to-day functions. The USTA highlights apparent discrepancies among various Umpires' testimony, arguing that duties vary so significantly from line to chair umpire that the inquiry associated with employee versus independent contractor is necessarily an individualized one. (Def.'s Opp. at 17.) This Court disagrees. While the line to chair umpire experience certainly varies at the margins, it appears from the deposition testimony, together with the declarations offered by the USTA—that most, if not all, Umpires perform a similar swath of duties. It is true that chair umpires can make certain calls that line umpires never do. However, these minor deviations do not eliminate the overriding consistencies present throughout all the testimony and the USTA's uniform policies of control governing all Umpires, which bolster the Court's determination that Umpires have similar primary responsibilities.

The USTA concedes that many Umpires, including Plaintiff Johnson, "regularly" work as both line umpires and chair umpires during a single tournament. (Dkt. No. 39 at 6; Opp. at 7; Kaufman Tr. at 114:20–22; *see also* Johnson Tr. at 63:12–16; Johnson Tr. at 143:10–17.) Thus, any distinction between line and chair umpire is blurred to the point of small differences. *Accord Youngblood*, 2011 WL 4597555, at *5 (noting that the

differences among employees did not preclude class certification, "particularly in view of the comprehensive written Family Dollar policy manuals and the testimony of Family Dollar's designated corporate executive that all store managers 'are responsible for getting recovery done' and for 'managing . . . the assets that are in the store,' and that their 'primary dut[y]' is '[t]o run a profitable store' ").

The USTA asserts that individual Umpires may have different understandings as to the meaning of their independent contractor agreements. (Def.'s Opp. at 9.) However, "the subjective intent of the parties in forming the employment relationship has little to no significance in determining whether a plaintiff is an independent contractor or employee." *Trejos v. Edita's Bar & Rest., Inc.*, 2009 WL 749891, at *2 (E.D.N.Y. Mar. 17, 2009) (denying motion for discovery regarding plaintiffs' intent). This case is only concerned with the U.S. Open. All of the Umpires' work is performed at a single tournament in Queens, and all relevant contracts choose the NYLL as governing law. (Pl. Br. at 7; Dkt. No. 43; Kurtz Exh. 16 at ¶ 13.)

Predominance requires meaningful consistency, not indistinguishable identity. Accordingly, this Court finds that common, rather than individual, issues predominate in this case.

### 2. Superior Method

■ "In addition to predominance, Rule 23(b)(3) requires that plaintiffs show 'that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' Fed.R.Civ.P. 23(b)(3). In examining superiority, Rule 23 directs courts to consider four, non-exhaustive, factors. . . . Plaintiffs plead the presence of the factors, and in light of the record, and this Court's finding with respect to predominance, class determination is superior to individualized litigation.

First, for most members of the putative class, pursuing this litigation individually would be a hindrance rather than a boon. [In Plaintiffs' favor], 'a class action will save an enormous amount in litigation costs for all parties and allow them to more efficiently prosecute their claims and defenses.' *Han v. Sterling Nat'l Morg. Co.*, No. 09 Civ. 5589, 2011 WL 4344235, at *11 (E.D.N.Y. Sept. 14, 2011). For a single, potentially misclassified [Umpire], the impetus to sue [the USTA] for what might constitute a small economic return is minimal. The alleged misclassification here applies to an entire class of [Umpires], rather than an individual, case-by-case determination. Additionally, the burden and expense of individual litigation would likely be prohibitive for most [USTA] plaintiffs." *Jacob*, 289 F.R.D. at 422–23.

"Second, this Court is not aware of any current litigation concerning this controversy. And third, the Southern District of New York is an appropriate forum given that," *id.* at 423, "the forum selection clause in the 'independent contractor' agreements chooses" this District. (Pl.'s Mem. at 25.) "Last, this class is manageable. It constitutes [hundreds of] putative members, and [the work at issue] is concentrated in a single, geographic area, rather than spanning the nation. As discussed above, [the Umpires'] duties are more alike than they are dissimilar, and as such, lend themselves to determination as a class. Accordingly, the class action is the superior method of determining the result in the instant case." *Jacob*, 289 F.R.D. at 423.

### D. Class Counsel

■ Finally, Plaintiffs request that the Court appoint Abbey Spanier Rodd & Abrams, LLP ("Abbey Spanier") and the Law Offices of Mitchell Schley, LLC ("Mitchell Schley ") as class counsel going forward. (Pl.'s Mem. at 23–24.) "The appointment of class counsel is governed by Rule 23(g) of the Federal Rules of Civil Procedure, which mandates that a court certifying a class appoint class counsel, and specifies that a court must consider:

(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. . . .

Fed.R.Civ.P. 23(g)(1)(A)(i)-(iv). Moreover, a court *may* also 'consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class.' *Id.* at 23(1)(B)." *Jacob*, 289 F.R.D. at 423.

Thus far, the work Plaintiffs' counsel have performed has involved voluminous discovery and difficult questions of both law and fact. Abbey Spanier and Mitchell Schley appear to be vigorous representatives of the putative class. Moreover, Abbey Spanier and Mitchell Schley have experience in handling class actions, knowledge of the pertinent law, and resources to commit to this representation. Therefore, Abbey Spanier and Mitchell Schley are appointed as class counsel.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motion for class certification is GRANTED and counsel for Plaintiffs are hereby appointed as class counsel.

The Clerk of Court is directed to close the motion at docket entry number 48.

SO ORDERED.